Brenda MESSER, Plaintiff,

v.

AMWAY CORPORATION, Defendant.

Civil Action No. 01–2264–KHV.

United States District Court,
D. Kansas.

June 13, 2002.

Elizabeth Drill Nay, Robert W. Tormohlen, William H. Meyer, Lewis, Rice & Fingersh, L.C., Kansas City, MO, for Brenda Messer.

Hal D. Meltzer, Shawn M. Rogers, Baker, Sterchi, Cowden & Rice, L.L.C., Overland Park, KS, for Amway Corp.

## MEMORANDUM AND ORDER AND ORDER TO SHOW CAUSE

VRATIL, District Judge.

Under theories of negligence and strict liability, plaintiff alleges that Amway Corporation ("Amway") is liable for injuries which she sustained while using Power Off Heavy Duty Stripper Concentrate. This matter is before the Court on Defendant Amway Corporation's Motion For Summary Judgment (Doc. # 39) filed February 5, 2002. For reasons stated below, the Court sustains in part Amway's motion.

### Factual Background

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiff.

### Plaintiff's Injury

Plaintiff sustained injuries while she was cleaning floors with Amway's Power Off Heavy Duty Stripper Concentrate ("Power Off Concentrate") at Salon Kalibre, a commercial business in Olathe, Kansas. Lisa White, who apparently worked at Salon Kalibre, had previously purchased both Power Off Concentrate and Power Off Floor Stripper, a pre-diluted ready-to-use version of the same product which Amway also manufactured. On March 22, 1997, White purchased a two and a half gallon container of Power Off Concentrate from Gwen Farrell, an independent Amway business owner.[1] Farrell normally receives her Amway products at EDI, a warehouse which is run by Mitchell & Associates, an Amway distributor.[2] Before she used it the following day, White read and understood the label on the container.[3]

On March 23, 1997, plaintiff, White and Jeremy Graves were cleaning Salon Kalibre. White prepared the stripping solution either by using a bucket and a measuring cup to combine three gallons of water and one cup of Power Off Concentrate or by pouring three gallons of water and one cup of Power Off Concentrate on the floor.[4] After White pre-

1. Plaintiff denies that Gwen Farrell, who sold the product, is an independent business owner. Plaintiff also denies that Farrell delivered the product to Salon Kalibre. These points are not material to the Court's ruling and need not be resolved.

2. Plaintiff denies that Farrell procured the container from EDI because Amway's citation does not support it. In its reply brief, Amway cites more evidence but none of it supports the proposition that Farrell's Power Off Concentrate came from EDI. Therefore the Court will not consider this fact.

3. Amway asserts that although White had read the label and had previously used Power Off Concentrate, she did not re-read the label after she purchased the concentrate on March 22, 1997. White's deposition testimony is to the contrary, see Deposition Of Lisa White (Exhibit C) in Exhibits To Memorandum In Support Of Defendant Amway Corporation's Motion For Summary Judgment ("Amway's Summary Judgment Exhibits") (Doc. # 41)

filed February 6, 2002 at 24:11–16, and the Court assumes that White read the label as she testified.

4. After the accident, White told an Amway representative that she had poured the Power Off Concentrate and water on the floor. During her deposition, White testified that she had diluted the Power Off Concentrate in a bucket, but she also testified that her statement to the Amway representative was accurate. Indeed, if White combined three gallons of water and one cup of Power Off Concentrate, the dilution ratio was 1:48. Amway's label for Power Off Concentrate instructs users to prepare a "1:5 dilution (26 oz. POWER OFF Heavy Duty Stripper Concentrate to 1 gallon hot water)." Plaintiff's position is that regardless how the dilution was accomplished, White over-diluted the Power Off Concentrate. See Status Conference Transcript.

pared the initial solution, she added Power Off Concentrate and water by pouring them on the floor. For over an hour, plaintiff and Graves kneeled in a diluted solution of Power Off Concentrate and cleaned the floor with scouring brushes.[5] Plaintiff did most of the scrubbing, but White and Graves also scrubbed on their hands and knees. Plaintiff knew that Power Off Concentrate had been mixed with water and shortly after she started stripping the floor, she noticed that her clothes were getting wet and pressing against her skin. After she finished cleaning the floor, her knees were discolored and burning and she decided to go the emergency room.

Lisa White asked her husband, Scott White, to cut the label off the Power Off Concentrate container. He removed from a container a label with the words "Amway Power Off." [6] Scott White gave the label to plaintiff and Lisa White, who took it with them to the Emergency Room at Olathe Medical Center. Scott White believes that the label had blue and white on it. Plaintiff believes that the label was red, white and black, like other Power Off Concentrate labels that she has seen since that time.

Plaintiff did not read the "Amway Power Off" label until she was in the car on the way to the hospital. The label that plaintiff read on the way to the hospital did not include the word "danger." Also, it did not list sodium metasilicate, ethanolamine, surfactants or any other ingredients. It did instruct users to wear rubber gloves and warned that the product could cause minor skin irritation. At her deposition, Amway produced the label which it attached to Power Off Concentrate in 1997; that label "tells a lot more" than the "Amway Power Off" label which plaintiff read on March 23, 1997. Messer Deposition (Exhibit F) in Amway's Summary Judgment Exhibits (Doc. # 41) at 141.

Lisa White or plaintiff gave the label to hospital personnel. According to White, a nurse held the label with rubber gloves and stated "There is no [sic] ingredients on this. What do you want me to do with it?" White Deposition (Exhibit C) in Amway's Summary Judgment Exhibits (Doc. # 41) at 30:6–8. The hospital kept the label and did not attach it to plaintiff's medical records or mention it in the records of plaintiff's emergency room visit.[7] The "Amway Power Off" label has not been produced in this litigation, but Amway has produced copies of the label which it attached to two and a half gallon containers of Power Off Concentrate containers in 1997. Amway's label does not match the label which plaintiff, Lisa White and Scott White have described.

Plaintiff had blisters on her hands, and the burns to her knees were so serious

---

5. The parties do not agree that the chemical solution which caused plaintiff's injuries was actually Power Off Concentrate, and Amway argues that plaintiff's self-serving hearsay comments are inadmissible to support her contention that it was. The Court interprets controverted facts in the light most favorable to plaintiff, however, and because she has cited admissible evidence that the solution was Power Off Concentrate, the Court will consider that fact to be established for the purposes of the summary judgment record.

6. The record does not contain any testimony from Scott White that specifically states he

removed a label from a Power Off Concentrate container. He testified that plaintiff and Lisa White asked him to "get the label off the product" and that the label contained the words "Amway Power Off." Deposition Of Scott White in Amway's Summary Judgment Exhibits" (Doc. # 41) at 17, 21.

7. The hospital records do not specifically refer to Power Off Concentrate. They merely state that "patient was using a cleaning chemical on the floor" and that her complaint was "floor stripper on both knees." Emergency Room Record (Exhibit H) in Amway's Summary Judgment Exhibits (Doc. # 41).

that her medical treatment ultimately included skin grafts.

## Power Off Concentrate And Its Warning Label

Amway Corporation began selling Power Off Concentrate and Power Off Floor Stripper, the pre-diluted ready-to-use product, in 1987. From 1990 to 1996, Amway sold 42,864 containers of Power Off Concentrate. Between January 1, 1997 and the end of March 1997, Amway sold 1,471 more containers of Power Off Concentrate.

Independent Amway distributors, such as EDI, may obtain Amway product literature that explains if and when a Material Safety Data Sheet ("MSDS") should be provided to customers.[8] Amway's "Business to Business Portfolio," which is available to distributors upon request, includes a MSDS for each of Amway's commercial products.[9] The portfolio specifically discusses the OSHA requirements with regard to Material Safety Data Sheets and how the OSHA regulations pertain to commercial customers. Although EDI did not receive product brochures unless it ordered them from Amway, it had ordered and received the "Business to Business Portfolio" in October 1996 and January 1997. In October 1996 and January 1997, it had also received Commercial Product Literature ("Starter") Pack(s) SA–1618, which included the most recent MSDS for Power Off Concentrate.[10] The "Business

8. OSHA requires chemical manufacturers to develop a MSDS for each hazardous chemical they produce. Employers are required to have a MSDS in the workplace for each hazardous chemical which they use. The MSDS must contain at least the following information: identity of the substance (including chemical and common name); physical and chemical characteristics of the hazardous chemical; physical hazards of the chemical; health hazards of the chemical; primary route(s) of entry; the OSHA permissible exposure limit, ACGIH Threshold Limit Value, and any other exposure limit used or recommended by the chemical manufacturer, importer, or employer preparing the material safety data sheet; whether the hazardous chemical is listed in the National Toxicology Program (NTP) Annual Report on Carcinogens (latest edition) or has been found to be a potential carcinogen in the International Agency for Research on Cancer (IARC) Monographs (latest editions), or by OSHA; any generally applicable precautions for safe handling and use; any generally applicable control measures; emergency and first aid procedures; the date of preparation of the material safety data sheet or the last change to it; and the name, address and telephone number of the chemical manufacturer, importer, employer or other responsible party preparing or distributing the material safety data sheet, who can provide additional information on the hazardous chemical and appropriate emergency procedures, if necessary. See 29 C.F.R. § 1910.1200(g).

9. The affidavit of Thomas Truszkowski, Amway's in-house safety expert, states that "Amway Business to Business Portfolio, Commercial Product Literature ["Starter"] Packs (SA–1618), and other literature are made available to all independent distributors of Amway products." Affidavit Of Thomas Truszkowski (Exhibit I) in Amway's Summary Judgment Exhibits (Doc. # 41) at ¶ 10. In his deposition, Truszkowski did not know how distributors learned of the "Business to Business Portfolio" which included the MSDS materials, but he clearly testified that Amway would send such information to distributors upon request.

10. Plaintiff attempts to controvert this factual statement. In response to a question whether he had any other literature regarding Power Off Concentrate, Mitchell said "No. That doesn't mean there wasn't any. It just means that I don't recall any. There are so many items today, it is hard to keep track of all of them." Deposition Of Steven Mitchell (Exhibit 7) in Plaintiff's Appendix (Doc. # 48) at 44:24–45:2. Mitchell's affidavit states that he did receive the MSDS for Power Off Concentrate in 1996 and 1997. This affidavit supplements, but does not controvert, his earlier testimony that he could not recall if he had received the Power Off Concentrate MSDS. The Court will therefore consider this fact.

to Business" pamphlets list all Amway products that have and require Material Safety Data Sheets.[11] In addition, independent distributors use a Wholesale Price Catalog (SA–13) which includes information on the distributor's obligation to provide Material Safety Data Sheets to commercial customers for Power Off Concentrate and other Amway products. Amway made no substantive revisions to the Material Safety Data Sheets for Power Off Concentrate for 1996 or 1997 and it made no revisions at all regarding usage, medical treatment or health hazards regarding skin or eye contact.

In 1996 and 1997, Amway used one label for 55 gallon containers and another label for two and a half gallon containers of Power Off Concentrate. The label which Amway used on the two and a half gallon containers after March 1995 is red, black and white. It reads as follows:

### FOR COMMERCIAL USE ONLY— NOT FOR HOUSEHOLD USE

### POWER OFF™
### HEAVY–DUTY STRIPPER CONCENTRATE

A heavy-duty, fast-acting stripper which removes the toughest finishes and waxes without ammonia or solvents. Unique patented formula! Specifically designed for commercial use. Effectively strips away finishes. Saves time and labor because less scrubbing is required. Easily handles even the toughest finishes including metal crosslinked.

FOR USE ON RESILIENT FLOORING: vinyl, vinyl composite, asphalt, rubber, linoleum, and sealed wood. FOR USE ON NON–RESILIENT FLOORING: terrazzo, slate, ceramic and marble.

**DIRECTIONS:** WEAR APPROPRIATE PERSONAL PROTECTION TO AVOID SKIN AND EYE CONTACT. 1. Use a 1:5 dilution (26 oz. POWER OFF Heavy Duty Stripper Concentrate to 1 gallon hot water). 2. Spread evenly on floor with a mop or applicator and let stand at least 5 minutes. DO NOT LET DRY. 3. Scrub with floor machine and stripping pad. 4. Use wet vacuum or mop to pick up solution. 5. Rinse thoroughly; several times if necessary. Pick up rinse water with wet vacuum or mop. 6. Let dry thoroughly. 7. Apply DURASHINE Floor Polish according to label use directions.

**DANGER:** CORROSIVE TO EYES AND SKIN. HARMFUL IF SWALLOWED. Contains sodium metasilicate and surfactants. Avoid contact with eyes, skin and mucous membranes. In case of contact, immediately flush with water for 15 minutes. Get prompt medical attention. If swallowed, do not induce vomiting. Give milk or water to drink and call a physician or poison control center immediately. Product also contains ethanolomine which upon inhalation overexposure may elicit respiratory irritation, kidney and liver damage. At recommended use dilution (1:5) product is a moderate eye irritant. **KEEP OUT OF REACH OF CHILDREN.**

11. Plaintiff complains that Amway's evidence does not specify that the sheets must be provided with the products or state when the listing was created. Amway responds that the list is from the 1997 "Business to Business" pamphlet, which states that it is the distributor's responsibility to provide an MSDS to each commercial customer. The pamphlet further states that Material Safety Data Sheets are included with each 55 gallon container of product, but distributors must order Material Safety Data Sheets for other sizes. The pamphlet does not specify how often a MSDS must be sent to commercial customers, merely that it must be sent and a new one must be sent when there are updates. Plaintiff does not contest the veracity of this statement, merely the citation. The Court will therefore consider this fact.

DO NOT FREEZE * CONTAINS NO PHOSPHATE

U.S. Pat. No. 4,857,114

COMMERCIAL PRODUCTS DIVISION

Mfd. by Amway Corp., Ada, MI 49355 U.S.A.

©1987, AMWAY CORPORATION, U.S.A. 507642

1995 Power Off Label (Exhibit J) in Amway's Summary Judgment Exhibits (Doc. # 41).

The "Amway Power Off" label that plaintiff read on March 23, 1997 did not resemble this label. Lisa White said that if this label had been on the Power Off Concentrate which she purchased, she would not have used it or let people get it on their skin. If it did get on their skin, she would have made them wash it off immediately. If the warning label had said "Danger, avoid skin contact" or "Danger, corrosive to skin," White would have avoided or tried to avoid letting the product touch her skin. White Deposition in Amway's Summary Judgment Exhibits (Doc. # 41) at 92:13–17.

Prior to plaintiff's injury, Amway had notice of one user who claimed to have been harmed by a Power Off product. On February 15, 1995, Wendi Wilcock reportedly received third degree burns after she used Power Off Floor Stripper, Amway's pre-diluted ready-to-use product. By February 17, 1995, two days later, Wilcock had contacted Amway and Amway had written Wilcock to request information. On February 19, 1995, Wilcock called Pittsburgh Poison Control. Amway's safety division did not recommend further tests or changes to the Power Off labels in the face of this information.

## Procedural History

On May 31, 2001, plaintiff filed suit against Amway, asserting five theories of negligence in Count I (negligent failure to warn, negligent design, negligent inspection, negligent testing and negligent distribution and sale), and strict liability under Count II.

On March 25, 2002, Amway filed a motion to exclude the testimony of plaintiff's expert witnesses. See Motion To Exclude Testimony Of Roger Wabeke And Carl Rossi, Ph.D. And Memorandum In Support (Doc. # 52). In response to Amway's motion, plaintiff explained that she only intended to offer expert testimony on the following four points: (1) "Power Off should not have been designed and sold in a concentrated solution;" (2) "Power Off's label was defective and falsely claimed that when Power Off was used as directed it would merely be a moderate eye irritant when in fact Power Off's active ingredients are known to cause third degree burns which could result in deep eye wounds and even blindness;" (3) "a MSDS should have been included with each container of Power Off;" and (4) "Power Off should not have been sold to non-professional users as it was unreasonably dangerous in ways that could not be appreciated by the ordinary consumer." Plaintiff's Response To Defendant's Daubert Motion (Doc. # 61) filed April 22, 2002 at 1–2.

On May 30, 2002, the Court held a status conference at which it sustained Amway's motion to exclude these four expert opinions. Specifically, among other things, the Court held that the experts had not applied any methodology that was shown to be consistent with generally accepted methodology in their fields of expertise, that the tendered opinions were beyond the scope of their expert reports, and that their expert opinions were irrelevant in light of plaintiff's factual theories and contentions. See Minute Sheet (Doc. # 72) and Status Conference Transcript.

Amway seeks summary judgment, asserting that (1) all of plaintiff's claims must fail because she has not shown that the

container of Power Off Concentrate reached her in substantially the same condition that it left Amway; (2) plaintiff's negligent warning claim must fail because Amway's warning was sufficient, plaintiff has no expert testimony to support her claim of hidden dangers and, in so far as the claim is based on Amway's MSDS for Power Off Concentrate, it must fail because Amway supplied these sheets to product distributors and had no obligation to distribute them to plaintiff; (3) plaintiff's negligent design claim must fail because she unforeseeably misused the product and she has not identified how the design was defective; (4) plaintiff's negligent inspection claim must fail because plaintiff has not identified what inspections Amway should have made; (5) plaintiff's negligent testing claim must fail because she has not alleged what defect the product had or what testing a manufacturer could have done that would have revealed that flaw; (6) plaintiff's negligent distribution claim must fail because plaintiff cannot establish that Lisa White and Salon Kalibre were "non-professional users" or that it was negligent in not providing training; (7) plaintiff's strict liability count must fail due to deficiencies in her allegations in the pretrial order; and (8) Amway is entitled to summary judgment on plaintiff's claim for punitive damages.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at

248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus.*, Inc., 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. See *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. See *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## Analysis[12]

■ Plaintiff premises her entire case on a theory of products liability. The Kansas Product Liability Act ("KPLA"), K.S.A. §§ 60–3301 to 60–3307, applies to all product liability claims regardless of the substantive theory of recovery. See *Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 126, 795 P.2d 915 (1990). Under the Act, a product liability claim, including one based on strict liability, can be "brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product." K.S.A. § 60–3302(c). Kansas law recognizes three ways in which a product may be defective: (1) a manufacturing defect; (2) a warning defect; and (3) a design defect. See *Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 114, 795 P.2d 915, 923 (1990). Plaintiff alleges warning and design defects.

## I. Common Prima Facie Elements

■ To establish a prima facie case based on negligence or strict liability in a products liability case, plaintiff must produce evidence to establish three elements: (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left defendant's control. See *Jenkins v. Amchem*

*Prods., Inc.*, 256 Kan. 602, 630, 886 P.2d 869, 886 (1994). Under Kansas law, regardless of the theory upon which recovery is sought for injury, proof that a product defect caused the injury is a prerequisite to recovery, and the condition which caused the injury—be it a manufacturing defect, a warning defect or a design defect—must have existed at the time the product left defendant's control. See *Wilcheck v. Doonan Truck & Equip., Inc.*, 220 Kan. 230, 235, 552 P.2d 938, 942 (1976); *Stadtherr v. Elite Logistics, Inc.*, No. 00–2471–JAR, 2002 WL 1067682, at *6 (D.Kan. May 7, 2002); Samarah v. Danek Med., Inc., 70 F.Supp.2d 1196, 1202 (D.Kan.1999).

## A. Warning Claims

■ Plaintiff alleges that Amway negligently failed to warn Power Off Concentrate users, in that it (1) failed to supply a MSDS to EDI, the product distributor; (2) failed to include a MSDS with each carton of Power Off Concentrate; and (3) used a deficient label which failed to sufficiently warn of the dangerous nature of Power Off Concentrate.[13] Amway denies that the label which plaintiff, Lisa White and Scott White saw was attached to a container of Power Off Concentrate. Indeed, Amway argues that it has never produced a label like the one which plaintiff, Lisa White and Scott White claim to have seen.[14] Plaintiff has not produced either the "Amway Pow-

---

**12.** In response to Amway's summary judgment motion, plaintiff elected to not follow Amway's organizational scheme. Amway, for example, has nine arguments in its motion, but plaintiff sets forth 20 "responsive" arguments. She does not label these responses to clarify which responses match each argument. Plaintiff's organizational scheme is confusing and has not necessarily set forth her claims in the clearest light.

**13.** Plaintiff based this third claim on the warning label she saw, not the one Amway produced during litigation. In addition, she

does not specify exactly how the label was deficient.

**14.** Plaintiff has identified the following differences between the "Amway Power Off" label which she saw and the label which Amway has produced: (1) unlike Amway's label, the label that plaintiff saw did not list sodium metasilicate, surfactants or ethanolamine as ingredients; (2) unlike Amway's label, the label which plaintiff saw only told users to wear rubber gloves and said that the product could cause minor skin irritation, while the Amway label told users to "WEAR APPROPRIATE

er Off" label which she allegedly saw or the container from which it came. Amway therefore argues that it is entitled to summary judgment because plaintiff has produced no evidence that it used the "Amway Power Off" label or that the label reached her in substantially the same condition as when it left Amway's control. In other words, Amway claims that plaintiff cannot show the third element of her prima facie case.

Plaintiff indeed cites no evidence that the "Amway Power Off" label which she saw was one which Amway prepared or attached to Power Off Concentrate. On the other hand, Amway has presented evidence that it did not use a label which matches the one which plaintiff claims to have seen and plaintiff has presented no evidence to the contrary. Given this record, a reasonably jury would necessarily conclude that (1) the label which plaintiff saw did not come from a container of Power Off Concentrate, so it was not Amway's product or label; (2) the label which Amway originally attached to a container of Power Off Concentrate was altered, removed or tampered with, and replaced by the one which plaintiff describes; or (3) the container contained Power Off Concentrate and the label was Amway's label, and the contrary testimony of plaintiff, Lisa White and Scott White is mistaken or untrue. The first two hypotheses are inconsistent with the premise that the label which plaintiff read was unchanged from the time it left Amway's control, and they are therefore fatal to plaintiff's prima facie

case. The third hypothesis is equally fatal to plaintiff's theory of the case. Plaintiff, Lisa White and Scott White have unequivocally testified that the label on the product which caused plaintiff's injuries was different from the 1997 label which Amway produced. See Messer Deposition (Exhibit F) in Amway's Summary Judgment Exhibits (Doc. # 41) at 141; Lisa White Deposition (Exhibit C) in Amway's Summary Judgment Exhibits (Doc. # 41) at 92:13–17; Deposition Of Scott White (Exhibit G) in Amway's Summary Judgment Exhibits" (Doc. # 41) filed at 17, 21. The possibility that a jury might disbelieve their testimony (and conclude that the product had to be Power Off Concentrate and the label had to be Amway's) does not create a genuine issue of material fact on the critical question whether the label reached plaintiff in substantially the same condition as when it left Amway's control. Plaintiff cannot survive summary judgment on the mere hope that a jury will disbelieve her testimony, or that of her witnesses, in favor of a theory that is clearly irreconcilable with the one that she proposes. See *Burns v. Board of Comm'rs of County of Jackson, Kansas,* 197 F.Supp.2d 1278, 1292 (D.Kan.2002) (summary judgment appropriate when plaintiff asserted that he was not sure reason for termination was pretextual and he had previously testified that he did not believe reason was pretextual); *Miller v. Pfizer Inc. (Roerig Division),* 196 F.Supp.2d 1095, 1123 (D.Kan. 2002) (cannot stave off summary judgment in hope that jury will disbelieve testimony

PERSONAL PROTECTION TO AVOID SKIN AND EYE CONTACT" and cautioned that Power Off Concentrate was "CORROSIVE TO SKIN AND EYES"; (3) Amway's label "tells a lot more" than the "Amway Power Off" label that plaintiff saw (Messer Deposition (Exhibit F) in Amway's Summary Judgment Exhibits (Doc. # 41) at 141); and (4) the "Amway Power Off" label did not say "Danger, avoid skin contact" or "Danger, corrosive to skin,"

while Amway's label cautioned that Power Off Concentrate was "CORROSIVE TO SKIN AND EYES" and warned users to "AVOID EYE AND SKIN CONTACT" (White Deposition in Amway's Summary Judgment Exhibits (Doc. # 41) at 92:13–17). The "Amway Power Off" label which plaintiff saw was either red, black and white (as plaintiff testified) or blue and white (as Scott White testified); Amway's label was red, black and white.

of witnesses). All of plaintiff's evidence on this point is that the "Amway Power Off" label which she, Scott White and Lisa White saw was different. The prospect that a jury might disbelieve this evidence does not create a genuine issue of material fact. See *Thompson v. Hubbard,* 257 F.3d 896, 899 (8th Cir.2001) (summary judgment appropriate when all evidence was consistent with defendant's theory and plaintiffs relied only on hope that jury would disbelieve it); *Hysten v. Burlington Northern & Santa Fe R. Co.,* 167 F.Supp.2d 1239, 1248 (D.Kan.2001) (unsupported allegation that jury might disbelieve evidence insufficient to survive summary judgment).

This factor is a prima facie element for all of plaintiff's warning label claims. Because she has not created a genuine issue of material fact on this point, Amway is entitled to summary judgment on any failure to warn claim based on the "Amway Power Off" label.

### B. Design Defect Claims

■ Although plaintiff has not shown that the label reached her in a substantially unaltered condition, she has produced some evidence that the product itself reached her in substantially the same condition as when it left Amway's control. Lisa White ordered and received Power Off Concentrate from Gwen Farrell, an Amway representative who in turn received it from an Amway distributor. Plaintiff, Lisa White and Scott White testified that the container which they used said "Amway Power Off." At this stage in the proceedings, viewing the facts in the light most favorable to plaintiff, Amway has not conclusively established that the product was not Power Off Concentrate or that (if it was Power Off Concentrate) it reached plaintiff in a condition other than the condition it was in when it left Amway's control. Amway is not entitled to summary judgment on this argument.

### II. Warning Claims

Plaintiff alleges that Amway is liable for negligent failure to warn, in that: (1) it violated unidentified administrative regulatory standards by failing to give EDI a MSDS;[15] (2) it should have included a MSDS with each carton of Power Off Concentrate; and (3) it attached a deficient warning label to Power Off Concentrate. See Pretrial Order (Doc. # 42) at 4. Plaintiff does not specify in what regard the label was deficient, and she has not produced any evidence that the label which she saw was substantially unaltered; therefore, as noted above, Amway is entitled to summary judgment on the latter claim. Amway argues that it is entitled to summary judgment on plaintiff's failure to warn claims because (1) it gave Mitchell a MSDS which complied with the OSHA Hazard Communication Standard, 29 C.F.R. § 1910.1200, and it had no obligation to distribute that MSDS to plaintiff; and (2) OSHA bars a private cause of action premised on an OSHA violation.

■ Under Kansas law, whether the claim is based on negligence or strict products liability, a manufacturer's failure to warn is measured by whether the warning was reasonable under the circumstances. See *Richter v. Limax Intern., Inc.,* 822 F.Supp. 1519, 1521 (D.Kan.1993). The applicable analysis for a failure to warn claim is based on negligence. *Id.* To this general duty to warn, the KPLA carves out several exceptions, none of which apply in this case.[16]

---

15. Plaintiff presumably refers to the OSHA Hazard Communication Standard, 29 C.F.R. § 1910.1200.

16. The KPLA, K.S.A. § 60–3305, provides, in pertinent part:

In any product liability claim any duty on the part of the manufacturer or seller of the

As an initial matter, the Court need not determine whether Amway is entitled to summary judgment on the theory that OSHA bars a private cause of action. Plaintiff brings suit for negligence and does not assert a private cause of action under OSHA. Plaintiff merely relies on OSHA regulations to establish Amway's negligence. The District Court of Kansas has previously held that "OSHA standards can be admitted to show evidence relating to standard of care" even though they "cannot be considered conclusive proof of negligence or the absence of negligence." *Martin v. MAPCO Ammonia Pipeline, Inc.,* 866 F.Supp. 1304, 1308 (D.Kan.1994).

■ As to the MSDS claims, plaintiff has not created a genuine issue of material fact whether EDI received a MSDS for Power Off Concentrate. Under the OSHA Hazard Communication Standard, 29 C.F.R. § 1910.1200(g)(6)(i), "[c]hemical manufacturers or importers shall ensure that distributors and employers are provided an appropriate material safety data sheet with their initial shipment, and with the first shipment after a material safety data sheet is updated." The affidavit of Steve Mitchell, owner of EDI, establishes that he received Material Safety Data Sheets for Power Off Concentrate in late 1996 and early 1997. Also, Amway has cited invoices which show that it sent him starter packs which included Material Safety Data Sheets at that time. While plaintiff claims that Mitchell did not receive a MSDS, her failure to establish a genuine issue of material fact on this point means that Amway is entitled to summary judgment on this claim.

■ Plaintiff also contends that even if Amway gave Mitchell a MSDS, it is liable because a prudent manufacturer would have supplied a MSDS with each carton of Power Off Concentrate. Plaintiff does not explain, in the pretrial order or elsewhere, how including a MSDS with each container of Power Off Concentrate would have averted her injuries. At the status conference, plaintiff's counsel explained that although you cannot guarantee that all people read warnings, including the MSDS with each container would be another layer of warnings and "you can never have too many warnings." See Status Conference Transcript. Plaintiff's counsel could not identify anything which was on the MSDS, but not the "Amway Power Off" label that plaintiff and Lisa White claim to have seen, that would have prevented plaintiff's injury. Furthermore, plaintiff has cited no evidence that she or Lisa White would have read a MSDS or heeded any warnings therein. The record contains no evidence which suggests that the mere presence of a MSDS, independent and regardless of its content, would have prevented plaintiff's injury. The possibility that plaintiff might have read and heeded a MSDS, when she did not read or head the "Amway Power Off" label, is pure speculation. Whether Lisa White would

---

product to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product, and any duty to have properly instructed in the use of such product shall not extend: (a) To warnings, protecting against or instructing with regard to those safeguards, precautions and actions which a reasonable user or consumer of the product, with the training, experience, education and any special knowledge the user or consumer did, should or was required to possess, could and should have taken for such user or consumer or others, under all the facts and circumstances; (b) to situations where the safeguards, precautions and actions would or should have been taken by a reasonable user or consumer of the product similarly situated exercising reasonable care, caution and procedure; or (c) to warnings, protecting against or instructing with regard to dangers, hazards or risks which are patent, open or obvious and which should have been realized by a reasonable user or consumer of the product.

have read a MSDS, and would have altered her behavior in a way that would have avoided plaintiff's injuries, is likewise unknown. It is well established that "mere speculation, conjecture, or surmise, unsupported by evidence, is insufficient to resist summary judgment." *Erasmus v. Wal–Mart Stores, Inc.*, 24 Fed.Appx. 979, 983, 2002 WL 12261, *4 (10th Cir. Jan.4, 2002) (citing Rice v. United States, 166 F.3d 1088, 1092 (10th Cir.1999)). Amway is entitled to summary judgment on this claim.

## III. Design Defect Claims

### A. Negligent Distribution Claim

■ Plaintiff makes two negligent distribution claims. First, she argues that since Power Off Concentrate was designed for professional use, a reasonably careful manufacturer would have (a) "trained its distributors about the difference between household and commercial cleaning products"; (b) "ensured that distributors were aware of the proper use for commercial products"; (c) "ensured that distributors were aware of the existence of MSDS sheets and the requirement to provide MSDS sheets under 'OSHA'"; and (d)

"ensured that distributors did not sell commercial products to non-professional users."[17] Pretrial Order (Doc. # 42) at 5. Second, she argues that a reasonably careful manufacturer would not have sold the Power Off in concentrated form to non-professional users. Amway argues that it is entitled to summary judgment because it provides its distributors materials which explain the difference between household and commercial cleaning products, the proper use for commercial products, and their duty to provide Material Safety Data Sheets. According to Amway, (1) it was already doing these things; and (2) any claim that it was not doing them is irrelevant because plaintiff cannot show that failure to do them was the proximate cause of her injuries. Furthermore, Amway argues that the fact Power Off Concentrate is sold in concentrated form is irrelevant to plaintiff's injuries because plaintiff was not injured by the Power Off Concentrate in its concentrated form.

■ Plaintiff does not explain how her injury would have been prevented if Amway had engaged in the distributor training activities that she recommends. In

---

17. In the Pretrial Order (Doc. # 42), plaintiff seems to argue both that Amway was negligent for allowing the product to be sold to non-professional users and that Amway was negligent for selling the product with an inadequate warning label. In response to Amway's contention that the latter argument merely restates her negligent warning claim, plaintiff appears to drop the latter argument. To the extent that plaintiff's negligent distribution claim is based on the adequacy of the warning label, it duplicates the warnings claim. Amway is therefore entitled to summary judgment on that aspect of plaintiff's claim.

In addition, the Pretrial Order (Doc. # 42) appears to state the same negligent distribution theory twice. Plaintiff claims that a reasonably careful manufacturer would not have sold Power Off Concentrate to non-professional users and would have ensured that

distributors did not sell Power Off Concentrate to non-professional users. Since these claims are duplicative, the Court will address them together.

Amway argues that Power Off Concentrate was designed for commercial use, not professional use as plaintiff alleges. Indeed, Amway's Power Off Concentrate label warned that the product was for commercial use only and not for household use. The record also shows that Salon Kalibre was a commercial establishment. Plaintiff responds that the distinction between "commercial" and "household" encompasses the distinction between "professional" and "non-professional" use. In other words, in plaintiff's view, non-professional users are household users—even if they use the product for commercial use. The interpretation of "not for commercial use" is open to interpretation and reasonable jurors might disagree on its meaning.

addition, she cites no evidence that Mitchell or Farrell were unaware of the difference between household and commercial cleaning products, the proper use for commercial products or the existence of Material Safety Data Sheets and their duty to provide them. Amway is therefore entitled to summary judgment on plaintiff's claim that it did not give its distributors sufficient information about the product or the MSDS for Power Off Concentrate.

■ As noted above, because Power Off Concentrate was formulated "for commercial use only—not for household use," plaintiff claims that Amway was negligent in allowing its distributors to sell it to non-professional users. Amway insists that it is entitled to summary judgment on this theory because plaintiff cannot establish that it had a duty not to sell Power Off Concentrate to non-professional users. Amway also argues that because there is no evidence that anyone has ever been harmed using the product, it had no reason to think that Power Off Concentrate was unreasonably dangerous for non-professional users; that plaintiff has not shown what criteria distinguish non-professional and professional users (or even that Lisa White belongs in the non-professional category); and that because Lisa White had previously purchased and used both Power Off Concentrate and Power Off Floor Stripper, that she was knowledgeable about both products and she made an informed choice which product she wanted to use. While plaintiff posits that Amway should only sell commercial products to professional floor-strippers, she does not directly address this argument. She cites Truszkowski's testimony that commercial and non-commercial products are different and that the average commercial product is not designed to be used by the average household user. The evidence is uncontroverted, however, that Lisa White did not purchase Power Off Concentrate for household use. She purchased it for commercial use at Salon Kalibre.

The record contains no evidence with regard to what constitutes a "professional" floor-stripper, whether Lisa White qualified as a professional floor-stripper, how professional floor-strippers perform their jobs or handle their floor-stripping products, or whether they would have handled the Power Off Concentrate in any way different from how Lisa White handled it. The record also lacks evidence that a professional floor-stripper would have mixed the concentrate in a different manner or to a different degree of dilution. In other words, the record contains no evidence that plaintiff's injury would have been prevented if Lisa White had been a professional floor-stripper. Amway is entitled to summary judgment on this claim.

■ Regarding plaintiff's second claim, Amway correctly notes that whether it sold Power Off Concentrate in a concentrated form is irrelevant to this case. The entire theory of plaintiff's case is that Power Off Concentrate is unreasonably dangerous when over-diluted. The pre-diluted state of the product is irrelevant and Amway is entitled to summary judgment plaintiff's claim that a reasonably careful manufacturer would not have sold Power Off Concentrate in concentrated form.

**B. Negligent Design Claim**

■ Under Kansas law, a manufacturer has a duty to use reasonable care in designing its products so that they will be reasonably safe for their intended use. See *Deines v. Vermeer Mfg. Co.*, 752 F.Supp. 989, 995 (D.Kan.1990) (citing *Garst v. General Motors Corp.*, 207 Kan. 2, 19, 484 P.2d 47, 60 (1971)). Kansas has adopted the consumer expectations test as the standard for design defects. See *Delaney v. Deere & Co.*, 268 Kan. 769, 772–773, 999 P.2d 930, 934–35 (2000) (citing *Barnes*

*v. Vega Indus., Inc.*, 234 Kan. 1012, 1013, 676 P.2d 761, 762 (Kan.1984)). A product is unreasonably dangerous only if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it. See *id.* (citing Restatement (Second) of Torts § 402A cmt.i). Plaintiff alleges that Amway negligently designed Power Off Concentrate, i.e. that it was not reasonably safe for its intended use because when diluted at a 1:5 ratio, it is sufficiently corrosive to cause third degree burns.

Amway argues that it is entitled to summary judgment because (1) plaintiff has not identified the specific aspect of its design that is defective; (2) plaintiff's failure to read and follow the directions constitutes unforeseeable product misuse which bars her claim; (3) plaintiff has not proposed any alternative design that eliminates the hazards of Power Off Concentrate and still retains its floor clearing prowess; and (4) plaintiff's negligent design claim merely restates her negligent warning label claim. Plaintiff responds that she has sufficiently identified her claim, that her use of the product was foreseeable, that it is not necessary for her to identify alternative designs and that her design claim is distinct from her warnings claim.

■ Amway first argues that plaintiff's negligent design claim must fail because the pretrial order does not identify what is defective about Power Off Concentrate. The pretrial order, however, alleges that Power Off Concentrate causes third degree chemical burns when diluted as directed. Although the pretrial order has not identified the specific chemicals which caused plaintiff's injury, it has identified the aspect of the product that is allegedly defective—its level of corrosiveness. This is sufficient to state a defective design claim. Compare *Burton v. R.J. Reynolds Tobacco Co.*, 181 F.Supp.2d 1256, 1262 (D.Kan.2002) (allegation that cigarettes deliver harmful quantities of nicotine and carbon monoxide sufficient) with *Samarah,* 70 F.Supp.2d at 1203 (allegation that device caused injury without specifying how it caused injury insufficient).

■ Amway next argues that it is entitled to summary judgment because plaintiff unforeseeably misused its product. Amway argues that its label directed users to spread the product on the floor with a mop or applicator, scrub the floor with a floor machine and stripping pad, use a wet vacuum or mop to pick up solution, and avoid letting the product touch their skin. Plaintiff admittedly did not follow these directions, but Amway's argument is entirely based on a label which plaintiff never saw. The Court cannot conclude as a matter of law that plaintiff's use of the product—absent the cited instructions—constituted misuse. Summary judgment on this issue is not appropriate.

■ Amway's third argument is that plaintiff's claim must fail because she has not alleged any alternative chemical formulation that would have been less dangerous yet still retained the product's essential character and qualities for performing its intended function. Kansas law, however, does not require plaintiff to propose a feasible alternative design as a prerequisite to recovery. Plaintiff is correct that "evidence of a safer alternative design is not required in all cases." *Jenkins,* 256 Kan. at 636–637, 886 P.2d at 890; see also *Burton,* 181 F.Supp.2d at 1261 n. 3 (evidence of safer alternative design not necessary to survive summary judgment on design defect claim). Evidence of a safer alternative design is only relevant when a defendant produces evidence that a safer design is not feasible. See *Jenkins,* 256 Kan. at 636–637, 886 P.2d at 890. Although Amway appears to argue that a safer formulation of Power Off Concen-

trate would eliminate its effectiveness as a cleaner, it cites no evidence in support of that contention. For these reasons, Amway is not entitled to summary judgment on this issue.

■ Amway's final argument is that plaintiff's negligent design claim is merely a restatement of her negligent warnings claim. In response to Amway's motion, plaintiff attempts to clarify her claim by stating that she is actually arguing that Power Off Concentrate is negligently designed because its concentration is too strong for its intended use. As plaintiff now states it, her negligent design claim is different from her warnings claim. Amway is not entitled to summary judgment on plaintiff's negligent design claim.

## C. Negligent Inspection Claim

■ Plaintiff alleges that Amway negligently inspected Power Off Concentrate because it "failed to discover that the diluted product (contrary to the label) was sufficiently corrosive to cause third degree chemical burns." Pretrial Order (Doc. # 42) at 6. Amway contends that plaintiff's negligent inspection claim must fail because it is merely a restatement of her negligent warnings claim and she has no expert testimony as to what inspections Amway should have made or what defect those inspections would have revealed.

The Kansas Supreme Court has noted that a "manufacturer has a duty to make such tests and inspections, during and after the process of manufacture, as should be recognized as being reasonably necessary to secure the production of a safe product; and a manufacturer who negligently fails to use reasonable care in making such tests and inspections, and thereby produces a defective article which causes damage while being put to an ordinary anticipated use, is liable for such damage." *Lindquist v. Ayerst Laboratories, Inc.*, 227 Kan. 308, 319–320, 607 P.2d 1339, 1350 (1980) (citing 1 Hursh and Bailey, American Law of Products Liability 2d § 2:29, p. 214 (1974)). In addition, the Kansas Supreme Court has noted that "plaintiff cannot succeed where [she] fails to allege or prove that tests or inspections would have been effective...." *Id.* (citing American Law of Products Liability 2d at 217).

The crux of plaintiff's argument, however, is not that Amway failed to inspect the product, but that it failed to inspect the product label. In response to Amway's motion, plaintiff argues that "[i]t is clear from reading Mrs. Messer's expert reports that Amway failed to 'inspect' ... the claims made on Power Off's label ... and compare those claims to the known qualities of the chemicals that compose Power Off." Plaintiff Brenda Messer's Response To Defendant Amway Corporation's Motion For Summary Judgment (Doc. # 47) filed March 11, 2002 at 46–47. Plaintiff cites no evidence that a label inspection would have revealed that the Power Off Concentrate was sufficiently corrosive to cause third degree burns when diluted to a ratio of 1:5 (let alone 1:48). For this reason, Amway is entitled to summary judgment on plaintiff's negligent inspection claim.

## D. Negligent Testing Claim

■ Plaintiff alleges that Amway negligently tested Power Off Concentrate because it "failed to discover that the diluted product (contrary to the label) was sufficiently corrosive to cause third degree chemical burns." Pretrial Order (Doc. # 42) at 6. Amway argues that it is entitled to summary judgment on plaintiff's negligent testing claim because she has not alleged what defect the product had or what reasonable testing would have revealed that flaw defect. Amway contends that it followed the OSHA toxicological testing methodology with respect to skin

and eye testing and reporting, and also argues that plaintiff's negligent testing claim in essence restates her negligent warnings claims.

■ Again, the crux of plaintiff's argument is that Amway failed to test the accuracy of the label and not that Amway failed to test for product defects. In opposing Amway's summary judgment motion, the analysis section of plaintiff's brief twice mentions testing. A heading on page 46 argues that "there is No Evidence ... that Amway Competently Conducted Any Testing to Determine if the ... Label Correctly Stated the Product's Destructive Attributes" *Id.* at 46.[18] Plaintiff's negligent testing claim is apparently a restatement of her negligent inspection claim. That claim failed because plaintiff did not allege what inspections Amway should have performed or what problems those inspections would have revealed. Furthermore, to the extent that plaintiff complains about a variance between the label and the product, her claim is one for failure to warn. For reasons previously stated, Amway is entitled to summary judgment on that theory. Finally, the record shows that Amway conducted toxicological tests on Power Off Concentrate. Plaintiff has not cited any expert testimony that Amway's testing was insufficient or suggested other tests that would have been more appropriate.[19] For these reasons, Amway is entitled to summary judgment on plaintiff's negligent testing claim.

## IV. Strict Liability Claim

In addition to her negligence claims, plaintiff asserts that "Amway is strictly liable because it sold a product that was defective in design, instructions, and warnings, and was unreasonably dangerous in that it was dangerous in the way it is ordinarily used considering the product's characteristics and common usage, and was dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it." Pretrial Order (Doc. # 42) filed February 8, 2002 at 6.

Essentially plaintiff asserts two strict liability claims, one for design and another for warnings. She argues that Power Off Concentrate is negligently designed since its corrosive chemicals can cause third degree burns even when it is properly diluted. In seeking summary judgment on plaintiff's strict liability claims, Amway relies upon many of its earlier arguments. As to both claims, Amway asserts that it is entitled to summary judgment because (1) plaintiff's strict liability claim has not specifically pled a particular defect with its product or label; and (2) plaintiff has not shown that the product which she was using was substantially unaltered after it left Amway's control; (3) its warning label was adequate; and (4) its product was not defective.

### A. Design Defect Claim

■ Under Kansas law, "there must be a specific claim concerning what aspect of the design was defective for a plaintiff to prevail on a strict liability design defect claim." *Jenkins*, 256 Kan. at 637, 886 P.2d at 890 (plaintiff's failure to identify what aspect of product was designed de-

---

18. The first sentence of this section notes Amway's contention that plaintiff has not demonstrated what inspections or tests it should have conducted, or shown what they would have revealed. Plaintiff proceeds to discuss inspection with no mention of testing.

19. Plaintiff identifies only one "test" which Amway should have performed: it could have inspected the Power Off Concentrate label and compared it to the known attributes of the chemicals in Power Off Concentrate. This is a restatement of plaintiff's negligent inspection claim and not a different testing claim.

fectively precluded strict liability design defect claim). Kansas law clearly contemplates that plaintiff will identify the condition or defect of the product that caused her injury. Plaintiff argues that her expert reports sufficiently identify the defect alleged: that Power Off Concentrate is formulated in a concentration which is far stronger than one which can be safely used.

 Liberally construing the pretrial order, most of plaintiff's negligence claims center on the theory that Power Off Concentrate is unreasonably dangerous because it is sufficiently corrosive to cause third degree burns even when diluted. Although this point should have been better spelled out with regard to plaintiff's strict liability theory, it was sufficient to alert Amway to the nature of plaintiff's strict liability design defect claim. Plaintiff has created a genuine issue of material fact whether Amway's product reached her in substantially unaltered form. None of the arguments advanced in Amway's motion for summary judgment exonerate it from liability for a design defect as a matter of law. Therefore Amway is not entitled to summary judgment on plaintiff's design defect strict liability claim.

**B. Warning Claims**

 In the pretrial order, plaintiff's negligent warning claims focus on deficiencies in the Power Off Concentrate label and the distribution of Material Safety Data Sheets. Plaintiff's strict liability claim does not appear to include her claim that the MSDS for Power Off Concentrate should have been included with each carton of Power Off Concentrate; she only claims that the label is inadequate. This claim fails for the same reason that her negligence-based warning label claim failed. Plaintiff has not shown that the label on "Amway Power Off" was substantially unaltered when the product reached her.

**V. Availability Of Punitive Damages**

Plaintiff alleges that she is entitled to punitive damages because (1) Amway continued to market and sell Power Off Concentrate and failed to revise its label, even though it knew that the diluted product could cause third degree burns, or (2) Amway failed to have a procedure in place to track or react to reports from poison control that users of its products had been injured. Amway contends that it is entitled to summary judgment on plaintiff's claim for punitive damages.

**A. Amway's Failure To Revise The Label After February 1995**

Amway argues that it should not be held liable for punitive damages for failure to revise the Power Off Concentrate label after it learned that Wendi Wilcock was injured using Power Off Floor Stripper. Amway points out that the ready-to-use product was different than the concentrated version and carried a different warning label. Amway also contends that the Power Off Concentrate label was adequate, despite the one reported injury with the ready-to-use product.

 In order to recover punitive damages, plaintiff must prove by clear and convincing evidence that Amway acted with willful conduct, wanton conduct, fraud or malice. See *Powell v. Havner*, 817 F.Supp. 90, 93 (D.Kan.1993) (citing K.S.A. § 60–3702(c)). On a motion for summary judgment, plaintiff bears the burden of producing sufficient evidence from which a reasonable juror could conclude by clear and convincing evidence that defendant has done so. See *Fusaro v. First Family Mortgage Corp.*, 17 Kan.App.2d 730, 735, 843 P.2d 737, 741 (1992). Under Kansas law, plaintiff must show that Amway's actions were performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the

probable consequences of the actions to prove that the actions were wanton. See *id.* Wantonness refers to the mental attitude of the wrongdoer rather than to a particular act of negligence. See *Gould v. Taco Bell,* 239 Kan. 564, 572, 722 P.2d 511, 518 (1986). Plaintiff is not required to show intentional wrongdoing to establish that Amway's conduct was "wanton." In order for a negligent act to constitute wantonness, so as to sustain recovery of punitive damages, the actor must be deemed to have realized the imminence of injury to others from acts or omissions and to have refrained from taking steps to prevent injury because of indifference as to whether such injury occurred. See *Atkinson v. Orkin Exterminating Co., Inc.,* 5 Kan. App.2d 739, 746, 625 P.2d 505 (1981).

█ From 1990 to March 1997, Amway sold 45,055 two and a half gallon containers of Power Off Concentrate and 496,392 one quart containers of ready-to-use Power Off Floor Stripper. During that time, only one user before plaintiff reported a third-degree chemical skin burn with either product. Amway argues that notice of one case report, involving a different product, cannot justify a punitive damage award on this record. The Court agrees. A reasonable jury could not find by clear and convincing evidence that Amway acted willfully, wantonly, fraudulently or maliciously when it continued to market Power Off Concentrate with its existing labels after it received notice of the Wendi Wilcock claim.

## B. Amway's Failure To Implement A Safety Monitoring Procedure

█ Amway argues that it retained the services of Pittsburgh Poison Control to handle injury reports, that David Aupperlee received quarterly reports which provided data on calls to Pittsburgh, and that plaintiff's contention that it did not have a procedure for tracking or reacting to injury reports from poison control is patently false. Amway also claims that plaintiff's failure to provide expert testimony on this issue is fatal to her claim. Plaintiff argues that she need not show what particular procedure Amway should have had, and that from Truszkowski's testimony it is unclear whether Amway had any procedure in place at all. As Amway points out, however, Truszkowski was not the head of product safety for Amway until 1998 and thus he lacks personal knowledge of earlier procedures.

Amway cites evidence that it had a procedure for tracking injury reports, as evidenced by its contract with Pittsburgh Poison Control from 1992 to 1997 and beyond. Plaintiff presents no evidence to controvert Amway's contention, and no reasonable jury would find by clear and convincing evidence on this record that Amway failed to implement a safety monitoring program out of fraud, malice, or willful or wanton disregard for her safety, so as to justify an award of punitive damages.

## Order To Show Cause

Although plaintiff's design defect claim has survived summary judgment, it is not without manifest problems. Specifically, plaintiff apparently has no evidence that Power Off Concentrate, when diluted to a ratio of 1:48, causes third degree burns. In her response to Amway's motion to exclude expert testimony, plaintiff disclaimed reliance on any expert opinion except the four which she expressly identified. None of the four opinions embrace a proposition that Power Off Concentrate causes third degree burns when it is diluted to a ratio of 1:48. The expert report of Roger L. Wabeke purports to address the question whether and to what extent the ingredients of Power Off Concentrate are "corrosive to human tissue." Wabeke Expert Report (Exhibit II) in Amway's Summary Judgment Exhibits (Doc. # 41) at 1. In his expert report, he opines as follows:

Sodium metasilicate is a strong inorganic base with properties similar to lye, caustic soda, and potash. It is an alkaline material. . . . A one-percent solution of sodium metasilicate in water has a pH of 12.6, making this a highly alkaline solution and presenting extreme hazards to the eyes, skin, gastrointestinal tract, all mucous membranes, and the respiratory tract. . . . Given sufficient contact time with a high concentration solution, sodium metasilicate will irreversible destroy skin, eyes, and other tissues in everybody [sic].

Ethanolamine is an organic nitrogenous base with properties chemically similar to ammonia. It is toxicologically more injurious to tissues than ammonia (mole for mole) because of its strong propensity to burrow and penetrate deeper into tissues than the ammonia molecule. Ethanolamine is used in many products in various concentrations. It is an effective floor wax remover because its organic character promotes dissolving accumulated wax residue, and sodium metasilicate saponifies waxes, oils, and fats making them more water-soluble. These very strong chemical properties are also what make Power Off so injurious to skin and eyes. . . . The pH of a 25% aqueous solution of ethanolamine is 12.1, making this chemical a strong alkali like sodium metasilicate. Power Off, therefore, contains two very strong alkalies (one organic, the other inorganic) with essentially identical pH from a toxicological perspective.

The third major ingredient, alcohol ethoxylate, comprises a mixture of C6 to C12 ethoxylated alcohols. These do not present a pH or acidity or alkalinity *per se*, but, as with ethanolamine, both are surfactants (surface-active agents). Both act by promoting deep penetration.

This very property that enhances wax removal is one that presents extraordinary injury potential to persons having skin and/or eye contact with Power Off. Also, please note that, according to the Amway MSDS for Power Off, the pH is listed as 12.5 to 13.5—close to the maximum pH of 14. Very few chemicals are more alkaline than those in Power Off. The hazard potential of Power Off is further increased since two of the product's ingredients are surfactants. In other words, Power Off is, all things considered, more hazardous than strong lye, since surfactants are in the product enhancing alkali solution penetration into healthy skin. Moreover, it should be noted than alkali burns are typically more insidious than acid burns since tissue destruction occurs often without the victim realizing it. Strong alkalis tend to anesthetize—at the same time destroying—sensory nerve endings. Whereas an acid contacting the skin normally alerts the victim to injury, alkalis, especially when strong, do not. Tissue destruction and the subsequent necrosis occur in many cases with no knowledge by the injured individual.

The toxicity of ethanolamine is remarkable. *To wit,* the oral LD50 (dose that is lethal to 50% of a group of test animals after ingestion) is 3320 milligrams per kilogram of body weight (mg/kg). However the dermal (skin-applied) LD50 in rats is only **1 mg/kg**. This considerably greater toxicity by the dermal route should be a sentinel signal to manufacturers including this ingredient in their formulations of commercials products—especially those ending up in the hands of persons with no chemical sophistication. [citations omitted.]

Wabeke Expert Report (Exhibit II) in Amway's Summary Judgment Exhibits" (Doc. # 41) at 3–6.[20] Wabeke's report con-

---

**20.** Wabeke's report hypothetically references a one percent solution of sodium metasilicate,

cedes, however, that "[t]he skin and eye hazards from contact with [the ingredients in Power Off Concentrate] depend on several variables," i.e. (1) the concentration of the chemical, (2) whether it is in solution or a dry powder or solid, (3) duration of contact, and (4) the presence of additional chemical agents that can promote burn injuries and tissue necrosis.

The expert report of Carl J. Rossi, Ph. D., discussed the corrosive effect of Power Off Concentrate as follows:

Amway's "Power Off" label states that two major chemicals in "Power Off" are sodium metasilicate and ethanolamine. The concentrate contains ten percent of each chemical for a total of twenty percent of the product. These chemicals each have a pH of 13. The pH scale runs from to 14. . . ."Power Off" has a pH of 13 which indicates that this product is about fifty thousand times more basic

(i.e. more corrosive) than a mild liquid dishwashing detergent.

Rossi Expert Report (Exhibit JJ) in Amway's Summary Judgment Exhibits (Doc. # 41) at 2–3. Dr. Rossi tested the pH of Power Off Concentrate at various dilutions (only up to 1:10), and concluded that

Even at a one to ten dilution, the Ph [sic] of Power Off is one hundred thousand times more caustic than ordinary liquid dishwashing solution. At the recommended use dilution of one to five, the Ph. [sic] of the resulting solution is in excess of one quarter of a million times more caustic than ordinary dishwashing solution.

Rossi Letter (Exhibit JJ) in Amway's Summary Judgment Exhibits (Doc. # 41) at 2.[21]

Again, it bears repeating that neither expert has tested or formulated a stated opinion that Power Off Concentrate is cor-

a 25 percent aqueous solution of ethanolamine, and an unspecified concentration of alcohol ethoxylate. Both he and Dr. Carl J. Rossi, Jr. assail the alkalinity of Power Off Concentrate in its undiluted state. Neither expert goes through the straightforward scientific exercise of computing the degree of plaintiff's exposure to sodium metasilicate, ethanolamine or alcohol ethoxylate when one part of Power Off Concentrate was diluted with 48 parts of water, and one can only speculate whether their comments—which assume much higher concentrations of Power Off Concentrate—pertain to the facts at issue in this case.

The Court has no expertise in chemistry, but it seems self-evident that if you take a 10 percent solution of sodium metasilicate and dilute it with five parts water, you have a 1.7 percent solution. See Deposition Of Carl J. Rossi, Ph.D. (Ex. O) in Amway's Summary Judgment Exhibits (Doc. # 41) at 21, 44 and 86; Expert Report Of Roger L. Wabeke (Ex. GG) in Amway's Summary Judgment Exhibits (Doc. # 41). By the same logic, if you dilute a 10 percent solution with 48 parts of water, you have a .20 percent solution of sodium metasilicate or ethanolamine. Nothing in the

record suggests that these ingredients of Power Off Concentrate are corrosive to human skin at those low levels. According to Wabeke, a 1:99 dilution of Power Off Concentrate has a "toxicologically significant alkaline pH of 10.74." *Id.* Such a dilution would yield a one percent solution of Power Off Concentrate (a .10 percent sodium metasilicate and .10 percent ethanolamine). The "toxicological significance" of these numbers remains a mystery. Nothing in the record suggests whether exposure to such relatively low doses could cause the injuries of which plaintiff complains.

21. Dr. Rossi does not explain why undiluted Power Off Concentrate is 50,000 more times more corrosive than a mild liquid dishwashing detergent but the same Power Off Concentrate diluted with ten parts of water, is 100,000 times more caustic than ordinary dishwashing solution—and diluted with five parts of water, is 250,000 times more caustic than ordinary dishwashing solution. Again, the Court has no chemical expertise but it defies common sense to suggest that Power Off Concentrate is more corrosive when mixed with five or ten parts of water than it is in its concentrated form.

rosive to human tissue at a dilution ratio of 1:48—the dilution to which plaintiff was exposed in this case. Furthermore, while Wabeke recognizes that the hazard from contact with Power Off Concentrate depends on several variables, he has not factored into his analysis a single one of those variables.

Plaintiff's counsel seems unattuned to the problematic nature of the expert testimony on which he relies. Throughout the status conference, in animated and articulate efforts to put forward his client's best case, he argued that (1) "one of the opinions Wabeke is intending to give is that at 5 to 1, this product ... can cause third degree burns"; (2) "both of these gentlemen who had the background of chemists ... they did studies on the product at different dilutions and came up with the opinions that at a 5 to 1 it would cause third degree chemical burns"; (3) "I've got to have these guys ... say that at a 5 to 1 it causes ... third degree chemical burns"; (4) "what I intend them to say is that in 1 to 5 it can cause third degree chemical burns to skin"; (5) "[t]he point is, I want them to come in and say that at a 1 to 5 it could in fact cause the injuries that Brenda Messer suffered"; (6) "I think I can make that connection with the jury, when they realize that this product at 1 to 5 can cause third degree burns"; and (7) "I think if a jury believes that this product, that even if properly diluted can cause third degree chemical burns, then it's defective."

Plaintiff's case, and all of her expert testimony, is premised on a fact which has no support in the record—that she sustained injury on account of exposure to a 1:5 combination of Power Off Concentrate and water. Because the undisputed evidence is that the ratio was 1 to 48 and because plaintiff has cited no admissible expert testimony that Power Off Concentrate is corrosive to human skin at that dilution, or that has taken into account the other variables which necessarily factor into the equation, the Court must wonder where this case is leading.

The Court therefore orders plaintiff to show cause in writing on or before 12:00 p.m. on Monday, June 17, 2002, why the Court should not direct the entry of judgment in favor of Amway on plaintiff's negligence and strict liability claims for defective product design. In that regard,

(1) Plaintiff's response shall proffer all evidence which she intends to introduce for the proposition that Power Off Concentrate, when mixed with water in a 1:48 ratio, causes third degree burns and therefore is unsafe for its intended use; and

(2) If plaintiff's sole evidence of product defect is that she was using a 1:48 mixture of Power Off Concentrate and water and she sustained injury, plaintiff shall cite legal authority for her position that such evidence entitles her to proceed to the jury.

The Court has reviewed Plaintiff's Rule 26(a)(3) Disclosures (Doc. # 70) filed May 28, 2002. Aside from Wabeke, the disclosures do not appear to list any expert witness who might competently testify that Power Off Concentrate, at a 1:48 dilution ratio, is corrosive to human skin.[22] As noted above, Wabeke's expert report does not address this issue and the issues which it does address (that Power Off Concentrate is corrosive to human skin at a 1 to 5 ratio, and even at a 1:99 ratio has a "toxicologically significant alkaline pH of 10.74") are not relevant to this case. It is therefore doubtful that Wabeke's opinions will assist the jury in understanding the

---

**22.** Plaintiff lists R. Quinn Brackett, Ph.D., and Amway's warnings expert, Howard Sandler, M.D., as potential witnesses. She does not identify the substance of their proposed testimony.

evidence or deciding the issue of liability. See Rule 702, Fed.R.Evid. Indeed, it would appear that the probative value of his testimony, even if relevant, is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury or waste of time, and that it should be excluded under Rule 403, Fed.R.Evid. The Court therefore orders plaintiff to show cause in writing on or before 12:00 p.m. on Monday, June 17, 2002, why Wabeke's testimony should not be excluded on those grounds.

**IT IS THEREFORE ORDERED** that Defendant Amway Corporation's Motion For Summary Judgment (Doc. # 39) filed February 5, 2002 be and hereby is **OVER-RULED in part.** Amway is not entitled to summary judgment on plaintiff's negligent design and design defect strict liability claims, but its motion for summary judgment is **SUSTAINED** as to plaintiff's claims for (1) negligent failure to warn; (2) negligent distribution; (3) negligent inspection; (4) negligent testing; (5) warning strict liability; and (6) punitive damages.

**IT IS FURTHER ORDERED** that plaintiff show cause in writing on or before 12:00 p.m. **Monday, June 17, 2002** (1) why the Court should not direct the entry of judgment in favor of Amway on plaintiff's remaining negligence and strict liability claims, as outlined above; and (2) why Wabeke's testimony should not be excluded for the reasons stated.